J-S22035-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRUCE JERMAINE MURRAY JR. | : | |
| | : | |
| Appellant | : | No. 1461 MDA 2020 |

Appeal from the Judgment of Sentence Entered August 4, 2020
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0003307-2019

BEFORE:  PANELLA, P.J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED JULY 23, 2021**

Bruce Jermaine Murray Jr. (Murray) appeals from the August 4, 2020 judgment of sentence[1] imposed by the Court of Common Pleas of York County (trial court) following his convictions by jury of aggravated assault, carrying a firearm without a license and persons not to possess a firearm.[2]  Murray

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Murray's notice of appeal purports to appeal from the August 4, 2020 judgment of sentence and the October 16, 2020 order denying his post-sentence motion.  "In a criminal action, appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions." **Commonwealth v. Shamberger**, 788 A.2d 408, 410 n.2 (Pa. Super. 2001) (*en banc*) (citation omitted).

[2] 18 Pa.C.S. §§ 2702(a)(1), 6106(a)(1) & 6105(a)(1).

challenges the sufficiency and weight of the evidence in support of his conviction for aggravated assault.  We affirm.

## I.

The trial court[3] summarized the facts of this case as follows:

At trial, Angela Matias testified that she and her husband own Valholla Entertainment, which is the management company of Pandora's Box & Grill, located at 466 East Market Street in York, Pennsylvania.  The regulars refer to Mrs. Matias as "Mom" and she [employs] up to eleven security personnel per night.  At the time of the incident in question, there were eighty-six security cameras in the establishment.  There is a zero tolerance policy in the bar wherein loud patrons are listened in on and if the subject is *not* innocuous then security separates the individuals.

On Sunday, October 14, 2018, at one o'clock in the morning, [Murray] was in the bar.  [Murray] was a regular who was in the bar a minimum of four times per week.  [Murray's] brother arrived later with Kason Dykes, who was known to Mrs. Matias (hereinafter:  Mom) as Kool-Aid.  Mom noticed things getting boisterous and approached [Murray] and Mr. Dykes separately— both told her that things were fine and [Murray] and Mr. Dykes exchanged hugs.

After a few minutes, voices were raised once more, which caused Mom to hug [Murray] and pat him down at the same time. [Murray] then went to the bathroom and Mr. Dykes followed him. Voices got louder.  Security pushed Mr. Dykes to the side and informed him that he needed to leave.  Mom stated both men were going to be asked to leave, but Mr. Dykes was closest to the door. The girl with [Murray] pulled him back, which caused him to trip over a stool and Mom described [Murray] as really upset about it. Mom never had a chance to ask [Murray] to leave because, while walking up front to Mr. Dykes, she realized that [Murray] was

_____

[3] The Honorable Michael E. Bortner presided over the trial, sentencing and the post-sentence motion hearing.  After his retirement, the case was reassigned to the Honorable Maria Musti Cook, who authored the opinion pursuant to Pa. R.A.P. 1925(a).

behind her. Mom was outside the bar on the ramp when [Murray] left and Mr. Dykes was already outside.

Mr. Dykes was upset, "throwing his arms up and talking loudly and kind of cursing a little bit because he was pissed off *because we put him out*." [Notes of Testimony, 3/3-5/20,] at 145 (emphasis added). Mom did not hear too much, but she heard the shot and she had heard Mr. Dykes saying "yo, yo come here, come here." *Id.*, at 151. Mom was shocked as the interlocutors had proclaimed themselves family and no threats had been made. Mom could not imagine any reason for [Murray] to have shot Mr. Dykes.

Police arrived pretty quickly and Mom was able to identify [Murray] as the shooter in a photo lineup that same morning. Mom never saw the victim with a gun or any weapon.

During cross-examination, the defense reviewed security footage with Mom and Mom testified that the victim seemed a little more boisterous or animated early on. Directed to footage of the victim poking [Murray] in the chest and the head, Mom stated: "[y]eah, but - - I'm sorry . . . [t]hey all talk like that all the time." *Id*. Directed to footage showing [Murray] hugging Mr. Dykes, Mom acknowledged and dismissed it as "this is what they always did[.]" *Id*., at 160. Directed to footage of Mr. Dykes pushing [Murray] who responds by walking away, Mom stated that she could see, in the video, the victim pushing [Murray's] arm. Somewhat confusingly, Mom stated that the incident was *not* serious enough that both men needed to leave the bar, but that she separated them and had them leave before it could escalate. Mom agreed that the only persons who knew what had transpired within the bar were [Murray] and the victim.

Mom testified that once the incident had moved outside, [Murray] came out pretty quickly after the victim because security was too tied up with the victim to do their usual routine of holding an interlocutor back while the other is ejected. As on direct, Mom confirmed that the victim, while outside, was screaming with his hands up. The victim then walked off-camera and followed [Murray] up the sidewalk and the victim said "yo, yo, come here" to [Murray]. *Id*., at 177. [Murray] kept walking without responding. Mom agreed that it appeared that the victim actually grabbed [Murray] by the shoulder and tried to spin him around.

The court inquired of Mom as to whether she observed [Murray] or victim to have a weapon on them. Mom responded that she did not and that she had given them hugs and touched their jackets and they did not have weapons.

Detective Travis Sowers was called and he testified that he was at home asleep when he was awoken by a call to investigate the shooting. Testifying along with video of the incident, Detective Sowers stated that you could see that [Murray] had his hand ready to pull the handgun out of his right pocket before the victim approached him. There was nothing in the victim's hands. The victim then approached [Murray] in the breezeway and was shot in the stomach before a second shot was fired; two shell casings were found. The gun then fell out of [Murray's] hand, the magazine fell out of the gun, and an unidentified male stepped on the gun before [Murray] picked it up. [Murray] then walked up the street before turning around and walking by the victim.

The parties stipulated that the victim was admitted to York Hospital, on October 14, 2018, with a gunshot wound to his abdomen. Detective Sowers met with the victim who identified [Murray] as the shooter. However, the victim would not elaborate as to why the shooting occurred.

[Murray] was not taken into custody for six months after the shooting and at no point did he come forward to tell investigators that he had to shoot the victim due to being terrified for his life or any similar reason. A prison phone call, placed on October 14, 2018, around 6:48 p.m., was recorded between [Murray] and his incarcerated brother in which he admitted to shooting the victim. In that phone call, [Murray] stated he had shot the victim in the chest and that it was over for Kool-Aid and it was going to be over for [Murray] as well. Specifically, [Murray] stated:

> It's over for me. I already know it's over for me anyways, bro. I just know I'll meet you ass nigga. I am out here. I don't give a fuck. You can't shit. I'll be with you. We can hit it, chill with each other for a little bit.

*Id*., at 209. [Murray] made no statements during that call about fearing for his life before the shooting. Rather, [Murray] states that it just happened. On cross-examination, the detective admitted that [Murray's] statement that it was over for him could have been referring to potential retaliation against him. On

redirect, the detective stated that he viewed the excerpt above as an admission of guilt since [Murray] was talking about chilling with his brother who was incarcerated. The detective then discussed the steps taken in an attempt to locate [Murray] and he reiterated that [Murray] never contacted him or anyone else from York City Police Department to state that he had to shoot the victim because [Murray] was in fear for his life. Additionally, the detective testified that the alleyway in the video leads to a parking lot area that is not a dead end.

Trial Court Opinion, 1/19/21, at 3-8 (cleaned up, some citations omitted).

Murray proceeded to a jury trial and was convicted of the above-mentioned charges. The trial court sentenced him to 78 to 156 months' incarceration on the count of aggravated assault. On the counts of carrying a firearm without a license and persons not to possess a firearm, the trial court sentenced him to concurrent periods of 42 to 82 months and 78 to 156 months of incarceration, respectively.

Murray filed a timely post-sentence motion challenging the weight of the evidence and the discretionary aspects of his sentence. Following a hearing, the trial court denied the motion. Murray timely appealed and he and the trial court have complied with Pa. R.A.P. 1925.

## II.

## A.

Murray first argues that the Commonwealth did not disprove his claim of self-defense beyond a reasonable doubt and, as a result, his conviction for

aggravated assault must be vacated.[4]  He argues that he reasonably believed

he was in danger of death or serious bodily injury when the victim approached

him from behind when they were outside and put his hand on Murray's

shoulder to spin him around.   He contends that he did not provoke the

argument in the bar and was leaving the premises when the victim approached

him outside.   Finally, he argued that he was unable to retreat because the

victim approached him as he was trying to leave the area and spun him

around, preventing him from leaving.

_____

[4] Our standard of review is well-settled:

> The standard we apply in reviewing the sufficiency of the evidence
> is whether viewing all the evidence admitted at trial in the light
> most favorable to the verdict winner, there is sufficient evidence
> to enable the fact-finder to find every element of the crime beyond
> a reasonable doubt.  In applying [this] test, we may not weigh the
> evidence and substitute our judgment for the fact-finder.   In
> addition, we note that the facts and circumstances established by
> the Commonwealth need not preclude every possibility of
> innocence.   Any doubts regarding a defendant's guilt may be
> resolved by the fact-finder unless the evidence is so weak and
> inconclusive that as a matter of law no probability of fact may be
> drawn from the combined circumstances.   The Commonwealth
> may sustain its burden of proving every element of the crime
> beyond a reasonable doubt by means of wholly circumstantial
> evidence.  Moreover, in applying the above test, the entire record
> must be evaluated and all evidence actually received must be
> considered.   Finally, the trier of fact while passing upon the
> credibility of witnesses and the weight of the evidence produced,
> is free to believe all, part or none of the evidence.

**Commonwealth v. Lopez**, 57 A.3d 74, 79 (Pa. Super. 2012) (citation
omitted).

"The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion."  18 Pa.C.S. § 505(a).

> [A]s provided by statute and as interpreted through our case law, to establish the defense of self-defense it must be shown that[:] a) the slayer was free from fault in provoking or continuing the difficulty which resulted in the slaying; b) that the slayer must have reasonably believed that he was in imminent danger of death or great bodily harm, and that there was a necessity to use such force in order to save himself therefrom; and c) the slayer did not violate any duty to retreat or to avoid the danger.

*Commonwealth v. Hansley*, 24 A.3d 410, 421 (Pa. Super. 2011) (citation and emphasis omitted); 18 Pa.C.S. § 505(b)(2).  When a defendant raises self-defense and there is some evidence introduced to justify such a finding, the Commonwealth bears the burden of disproving the defense beyond a reasonable doubt.  *Commonwealth v. Mouzon*, 53 A.3d 738, 740-41 (Pa. 2012).  The Commonwealth sustains its burden by disproving any of the elements of a self-defense claim.  *Id.*

Finally, while the "law does not require an accused to elect an avenue of retreat where a reasonably prudent person would conclude that such a decision would increase his or her exposure to the threatened harm," a defendant has a duty to retreat and may not use deadly force if he "knows the avenue of retreat is available." *Commonwealth v. Ventura*, 975 A.2d 1128, 1143-44 (Pa. Super. 2009).

Viewed in the light most favorable to the Commonwealth, the evidence adduced at trial established beyond a reasonable doubt that Murray violated his duty to retreat when he shot the unarmed victim two times in the breezeway. Detective Sowers testified that the breezeway where the shooting occurred led to a parking lot, providing Murray with an avenue for retreat. The record supports the conclusion that Murray was aware of this avenue of retreat, as he was walking down the breezeway and toward the parking lot when the victim approached him from behind. Murray reached his hand into his pocket to hold the gun while he was walking down the breezeway before the victim approached him from behind. While the victim did grab Murray by the shoulder to turn him around, the evidence adduced at trial established that the victim was unarmed. No weapon was recovered from the victim and Mom testified that she patted him down while inside the bar and did not feel a firearm. The victim did not prevent Murray from retreating by merely grabbing him by the shoulder, and there was no evidence to support the conclusion that retreat from that interaction would have "exposed him to additional harm." *Ventura*, *supra*. Murray's first claim is meritless.

**B.**

Next, Murray argues that the trial court abused its discretion in denying his motion for a new trial based on the weight of the evidence.[5] He points out that he attempted to leave the scene but the victim continued the interaction by following him into the breezeway and grabbing him by the shoulder. He claims that because the victim pursued him, he reasonably believed that he had to use force to protect himself and would be prevented from retreating further down the breezeway.

"An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court." *Commonwealth v. Sullivan*, 820 A.2d 795, 805-06 (Pa. Super. 2003) (citation omitted). "Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny

---

[5] When evaluating a challenge to the weight of the evidence to support a conviction, this court does not reweigh the evidence presented at trial, but rather evaluates the trial court's denial of the motion for a new trial for an abuse of discretion. *Commonwealth v. Clay*, 64 A.3d 1049, 1054-55 (Pa. 2013). An abuse of discretion occurs "where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will." *Id.* (citation omitted). A trial court's determination that the verdict was not against the weight of the evidence is "[o]ne of the least assailable reasons for granting a new trial." *Id.* (citation omitted).

justice." ***Commonwealth v. Widmer***, 744 A.2d 745, 752 (Pa. 2000) (quotations omitted). A new trial is appropriate only when the verdict "is so contrary to the evidence as to shock one's sense of justice." ***Commonwealth v. Olsen***, 82 A.3d 1041, 1049 (Pa. Super. 2013) (citation omitted). "[T]he evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." ***Commonwealth v. Akhmedov***, 216 A.3d 307, 326 (Pa. Super. 2019) (*en banc*) (citation omitted).

The trial court did not abuse its discretion in denying relief on this claim. The evidence at trial showed that Murray and the victim engaged in a dispute in the bar and were approached twice by the employees before they were removed from the establishment. Murray then left the bar and proceeded to walk toward the parking lot. He had his hand on the gun in his pocket before the victim approached him from behind and fired two shots immediately upon turning around, even though the victim was unarmed. The jury was entitled to credit the Commonwealth's version of events and find that Murray could have continued to leave the scene after the victim approached him in the breezeway, rather than immediately responding with deadly force. Such a determination was well-within the province of the fact-finder and the facts supporting self-defense were not so weighty and indisputable as to clearly outweigh the evidence that Murray was able to retreat. The trial court properly denied relief on this claim.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/23/2021